## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | |
| | ) | Chapter 7 |
| PETER LEGRAND CARMACK, | ) | Case No. 17-41438-CJP |
|     Debtor | ) | |
| _____ | ) | |
| In re: | ) | |
| | ) | Chapter 7 |
| OLIVER KANAGA CARMACK, | ) | Case No. 17-41439-CJP |
|     Debtor | ) | |
| _____ | ) | |
| ELEMENTS CAPITAL GROUP AND | ) | |
| CAPITAL COMMUNITY BANK, | ) | AP No. 17-04067-CJP |
|     Plaintiffs | ) | (Lead Adversary Proceeding) |
| | ) | |
| v. | ) | |
| | ) | |
| PETER LEGRAND CARMACK, | ) | |
|     Defendant | ) | |
| _____ | ) | |
| ROBERT DOANE, | ) | AP No. 17-04068-CJP |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OLIVER KANAGA CARMACK, | ) | |
|     Defendant | ) | |
| _____ | ) | |
| ELEMENTS CAPITAL GROUP AND | ) | |
| CAPITAL COMMUNITY BANK, | ) | AP No. 17-04069-CJP |
|     Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OLIVER KANAGA CARMACK, | ) | |
|     Defendant | ) | |
| _____ | ) | |

1

| | | |
|---|---|---|
| ROBERT DOANE,<br>    Plaintiff | ) <br> ) <br> ) <br> ) | AP No. 17-04070-CJP |
| v. | ) <br> ) | |
| PETER LEGRAND CARMACK,<br>    Defendant | ) <br> ) <br> ) | |
| FROG FUNDING, LLC,<br>    Plaintiff | ) <br> ) <br> ) <br> ) | AP No. 18-04009-CJP |
| v. | ) <br> ) | |
| PETER LEGRAND CARMACK,<br>    Defendant | ) <br> ) <br> ) | |
| FROG FUNDING, LLC,<br>    Plaintiff | ) <br> ) <br> ) <br> ) | AP No. 18-04010-CJP |
| v. | ) <br> ) | |
| OLIVER KANAGA CARMACK,<br>    Defendant | ) <br> ) <br> ) | |

## <u>MEMORANDUM OF DECISION</u>

### I.   <u>Introduction</u>

Before the Court are the 11 U.S.C. §§ 727(a)(2), (a)(4), and (a)(7)[1] counts (the "727

Claims") asserted in these consolidated adversary proceedings[2] filed in the chapter 7 cases of

Peter LeGrand Carmack ("Peter") and Oliver Kanaga Carmack ("Oliver," together with Peter,

the "Debtors" or "Defendants") pursuant to which the plaintiffs Elements Capital Group, Capital

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code").

[2] Adversary Proceeding No. 17-04067 has been designated as the lead case during Phase 1 of these bifurcated proceedings dealing exclusively with the 727 Claims.

Community Bank, Robert Doane, and Frog Funding, LLC (collectively, the "Plaintiffs," together with the Defendants, the "Parties") object to the Debtors being granted discharges. In reaching its determination, the Court considered the demeanor and credibility of the witnesses who testified at the two-day trial conducted in this matter on September 26 and 27, 2018—Peter, Oliver, Jacob Carmack ("Jacob"), and James Truax, the 42 exhibits admitted into evidence, statements under oath made by the Debtors in filings in these cases, the stipulated statement of facts submitted by the Parties in their Joint Pretrial Memorandum, allegations in the Complaints admitted by the Debtors, the Court's docket, and the arguments made by counsel at trial. The following decision constitutes the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Rules").

While the Debtors and their brother, Jacob, testified regarding certain actions purportedly taken to "save" the business of GreenMind Energy LLC ("GreenMind") and their personal entrepreneurial efforts, relationships, and sacrifices, with which the Court empathized, ultimately, the Court must apply the law based on the evidentiary record before it and rely on its assessment of the testimony in relation to other evidence introduced in this matter.  For the reasons that will be discussed, the Court must find for the Plaintiffs on the §§ 727(a)(2), (a)(4)(A), and (a)(7) counts.

In finding for the Plaintiffs, it is not necessary for the Court to reach the *alter ego* theories and related claims presented by the Plaintiffs that (i) transfers by GreenMind constituted transfers of "property of the debtor" under § 727(a)(2) and (ii) assets and liabilities of GreenMind not disclosed as property of the Debtors in the Debtors' schedules and Statements of Financial Affairs ("SoFAs") provided a basis for relief pursuant to § 727(a)(4).  *See Agin v. Cusson (In re Cusson)*, 557 B.R. 15, 37 (Bankr. D. Mass. 2016) (discussing the issues presented

by §§ 727(a)(2)(B) and (a)(4)(A) claims premised on allegations that assets of a third party were really that of a debtor). The Court's ruling rests on the material disclosures and omissions made by each of the Debtors regarding his individual schedules and SoFAs with, at the very least, reckless indifference to their accuracy, and transfers made by the Debtors from their personal accounts to Jacob, which the Court concludes the Debtors undertook as part of a coordinated effort to hinder, delay, or defraud creditors so that the Debtors could control the limited amount of remaining funds generated through their business venture and use those funds as they determined without interference.

## II.      **Jurisdiction and Burden of Proof**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and Rule 201 of the Local Rules of the United States District Court for the District of Massachusetts. The determination of § 727 claims is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). In their Joint Pretrial Memorandum, the Parties acknowledged that this Court has authority to enter a final order with respect to the 727 Claims.

At the outset of the trial, the Parties had no objection to the Court's determination that the standard of proof for each element of the 727 Claims asserted in the Plaintiffs' respective complaints is by a preponderance of the evidence and that the initial burden of proof and burden of production as to each element rests with the Plaintiffs.  *See Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987); *see also Grogan v. Garner*, 498 U.S. 279, 287 (1991) (applying the preponderance of the evidence standard to an action for exception to discharge under § 523 of the Bankruptcy Code).

## III.      **Facts**

In 2015, the Debtors, who are brothers, and Jacob, another of their brothers, started a

residential solar panel dealership business in Idaho, forming two businesses: (1) GreenMind

Holdings ("Holdings") and (2) GreenMind. Initially, each of the three brothers held a one-

third ownership interest in GreenMind. They did not enter into a written LLC agreement.

Jacob subsequently relinquished his ownership interest, and the Debtors each became 50

percent owners and "Co-CEOs" of GreenMind. In or around October 2016, the Debtors

registered GreenMind as a foreign LLC doing business in Massachusetts and relocated to

Fitchburg, Massachusetts.

Instead of pursuing seed funding or investment capital, the Debtors funded their

business through purchases made on their personal credit cards and loans to the business from

cash advances on their personal credit cards. The loans were not documented. GreenMind

eventually obtained loans from non-bank lenders, including Frog Funding, LLC ("Frog

Funding"). Some of these lenders required daily loan repayments, which were withdrawn

from GreenMind's Wells Fargo Bank, N.A. ("Wells Fargo") business checking operating

account ending in 8223 (the "GreenMind Operating Account"). The Debtors personally

guaranteed some or all of these loans and testified that they believed that they were

personally liable to the creditors of GreenMind.

On January 31, 2017, GreenMind and Elements Capital Group ("Elements")

entered into a Financial Marketing and Servicing Agreement, pursuant to which Capital

Community Bank ("CCB"), through Elements as servicer, provided GreenMind customers

with loans to purchase solar panels. GreenMind would offer its customers financing

through Elements, and Elements, through CCB, would provide loans to qualified

customers. The Debtors admitted in their answer to the Complaint of CCB and Elements

that:

5

after GreenMind located a new customer and that customer was approved for funding by [CCB and Elements], 75 percent of the customer's loan proceeds (minus . . . servicing fees) would be deposited into GreenMind's account at the Bank. GreenMind could then transfer those funds to its operating account in order to use the funds to complete the particular customer's solar installation. GreenMind, acting through the Debtor[s], represented to [CCB and Elements] in January 2017 as a condition of receiving the funds that this initial funding would be used to complete the solar projects. Once GreenMind certified completion of an installation, it was eligible to receive the remaining 25 percent of the customer's loan proceeds.

Compl. ¶ 36; Answer ¶ 36. The Debtors further admitted that "from about February 2017 to July 2017, Elements approved loans for about 30 customers, totaling about $943,221.01. Of that amount, GreenMind received from [CCB] about $740,684.90 in initial and final funding." *Id*. at ¶¶ 55. However, GreenMind completed installations for only a few of the customers. GreenMind did not perform substantial work for the remainder of the customers and was never profitable.

The Debtors testified that on or about July 12, 2017, CCB "abruptly" informed GreenMind that it would not fund any future solar projects that might be "sold" to customers by GreenMind.  At that time, CCB was GreenMind's only solar project funding source.  Each of the Debtors testified that GreenMind would require a new source of funding to survive. From July 3, 2017 until July 14, 2017, the Debtors had caused GreenMind to obtain a series of loans from a number of alternative, non-bank lenders totaling $142,756.44, concluding with a loan from Frog Funding in the amount of $16,465, the proceeds of which were transferred into the GreenMind Operating Account on July 14, 2017.[3]  The Debtors do not

---

[3] The dates, lenders, and loan amounts are as follows:

    a.  7/03/2017, Richmond Capital Group, $12,502.00;
    b.  7/03/2017, Complete Business Solutions, $23,321.76;
    c.  7/03/2017, Capital Community Bank, $18,721.00;
    d.  7/03/2017, Eys Capital, LLC, $23,500.00;
    e.  7/05/2017, Bluevine Capital, $6,722.00;

appear to have used any of the loan proceeds for materials to continue with solar panel

installations that were in process; instead, they used funds for payroll and loan payments,

among other things.

The evidence established the following regarding bank accounts that are relevant to this

action:

    a. The Debtors controlled the GreenMind Operating Account. As of July 13, 2017, the account had a balance of $10,358.85.

    b. Peter and his wife, Jill Carmack,  jointly possessed a college checking account at Wells Fargo (Account No. ending 5128) ("#5128").

    c. Peter possessed a bank account at Digital  Federal Credit Union ("DCU") (Account No. ending 2812) ("#2812").

    d. Oliver and his wife, Soye Choi,  jointly possessed a college checking account at Wells Fargo (Account No. ending  0560) ("#0560").

    e. Oliver possessed a bank account at DCU (Account No. ending 0782) ("#0782").

    f. On or around July 12, 2017, Peter, Oliver, and Jacob each opened a Core checking account at Bank of America (Account Nos. ending 7989 ("#7989"), 7992 ("#7992"), and 7976 ("#7976"), respectively).

In or around July 2017, the Debtors authorized the following transfers between

GreenMind's account, their own personal accounts listed above, and  Jacob's personal account:

    a. On July 14, 2017, the Debtors transferred a total of $35,000 from the GreenMind Operating Account.  Of this amount, $23,000 was transferred to Peter's  Wells Fargo checking account (#5128), and $12,000 was transferred to Oliver's  Wells Fargo checking account (#0560).

    b. Also on July 14, 2017, Peter transferred $11,000 from his Wells Fargo checking account back into the GreenMind Operating Account and Oliver

---

    f.  7/05/2017, Cardinal Equity, LLC, $15,495.00;
    g.  7/05/2017, Kabbage, Inc., $2,300.00;
    h.  7/11/2017, Bluewave Financial Company, $9,776.40;
    i.  7/12/2017, DS Finance, $13,953.28; and
    j.  7/14/2017, Frog Funding, $16,465.00.

transferred $2,000 from his Wells Fargo checking account back into the GreenMind Operating Account.  As a result of these transfers, Peter obtained a total of $12,000 and Oliver obtained a total of $10,000 from the GreenMind Operating Account.

c.  Also on July 14, 2017, Oliver transferred the $10,000 he obtained from the GreenMind Operating Account from his Wells Fargo checking account (#0560) to his DCU checking account (#0782).

d.  Also on July 14, 2017, Peter made three separate transfers of $6,000, $4,000, and $2,000 from his Wells Fargo checking account (#5128) to his DCU checking account (#2812).

e.  On July 18, 2017, Oliver withdrew the remaining balance of $499.56  from his Wells Fargo checking account (#0560).

f.  On July 18, 2017, Peter made two cash withdrawals totaling $12,000  from his DCU checking account (#2812).

g.  On July 18, 2017, Peter made two deposits totaling $1,112 into his Bank of America checking account (#7989).

h.  On July 18, 2017, Jacob made a counter deposit of $11,000 into his  Bank of America checking account (#7976).

i.  On July 19, 2017, Oliver transferred $10,000 back from his DCU checking account (#0782) to his Wells Fargo checking  account (#0560).

j.  On July 19, 2017, Peter transferred $4,434.63 from the GreenMind Operating Account (#8223) to his DCU checking  account (# 2812).

k.  On July 19, 2017, Jacob made an ATM deposit of $1,000, a counter deposit of $494.58, and a second ATM deposit of $40.00 into his Bank of America  checking account (#7976).

l.  On July 19, 2017, Jacob wrote check number 91 for $5,917 from his  Bank of America checking account (#7976).

m.  On July 20, 2017, Oliver withdrew $10,000 in cash from his Wells  Fargo checking account (#0560).

n.  On July 20, 2017, Peter made a cash withdrawal for $3,411 from his  DCU checking account (#2812).

o.  On July 20, 2017, Jacob made separate counter deposits of $10,200.39 and $2,761.00 into his Bank of America checking account (#7976).

p. On July 20, 2017, Jacob made a check card payment for $555 to NRAI Services, LLC from his Bank of America checking account (#7976).

q. On July 19 and 20, 2017, Peter made three cash withdrawals totaling $1,350 from his Bank of America checking account (#7989).

r. On July 21, 2017, Jacob made an ATM withdrawal of $380 from his Bank of America checking account (#7976).

s. On July 24, 2017, Jacob made a cash withdrawal of $2,950 from his Bank of America checking account (#7976).

t. On July 24, 2017, Oliver received a transfer for $7,310 in his Bank of America checking account (#7992) from Jacob's Bank of America checking account (#7996).

u. On July 24, 2017, Peter received a transfer for $7,310 in his Bank of America checking account (#7989) from Jacob's Bank of America checking account (#7996).

The Debtors testified that there were several reasons that they caused the funds to be transferred from GreenMind to themselves personally: (1) frustration with the administration of the business account by Wells Fargo; (2) a desire for a bank with more convenient locations, given the distance of the nearest Wells Fargo branch from GreenMind's offices; and (3) a desire to establish "new" banking relationships using the Debtors' and Jacob's personal credit—bolstered by cash deposits—that might lead to financing that would address GreenMind's urgent cash flow issues.  During their examination by Plaintiffs' counsel at trial, both Oliver and Peter were confronted with the fact that neither had testified at their Rule 2004 examinations that the transfer of funds from the GreenMind Operating Account was part of an effort to establish banking relationships for either them or Jacob to obtain new loans from DCU or Bank of America.

The Debtors did not present any evidence that they submitted any formal loan application to DCU or that they requested a loan application package. The Debtors testified that they quickly learned that DCU would not extend credit to them after a conversation with an unnamed

9

representative. This purportedly prompted the Debtors to remove the funds from DCU and

transfer the funds in cash to Jacob for him to deposit in his personal Bank of America account

that had been established on July 12, 2017—two days before the funds were transferred from the

GreenMind Operating Account to the Debtors and before the Debtors withdrew the funds from

their respective DCU accounts.

When asked why the Debtors transferred cash to Jacob, Peter testified that he wanted

Bank of America to see a "deposit" rather than a "transfer," and Jacob expressed his view that a

bank would likely be more impressed with the financial capabilities of a customer that deposited

cash.  The Debtors did not present any evidence that Jacob submitted any formal loan application

to Bank of America or that he requested a loan application package.  Instead, Jacob testified that,

after a conversation with an unidentified representative of Bank of America, he determined that

the prospect that he could obtain a loan for the use of GreenMind was not promising and that he

was instructed by the Debtors on or about July 24, 2017 to transfer back to the Debtors most of

the money that they had given to him.  Jacob caused $7,310 to be transferred to each of the

Debtors' recently opened Bank of America accounts ending in 7989 and 7992, respectively, and

testified that he also withdrew cash in the amount of $2,950 that he handed to one of the Debtors.

(Ex. 30). He did not know why he was instructed to withdraw that amount in cash.

Jacob retained $2,008.97 in his personal account at Bank of America, which bank records

show was withdrawn in small amounts of cash, used for purchases of food and other personal

items, and was electronically transferred to "Robinhood" in a series of small transactions totaling

approximately $500 from August 14, 2017 through August 23, 2017. (Exs. 29–30). Peter and

Jacob each testified that they understood Robinhood to be an online stock and bitcoin trading

application.  Jacob was unclear in his testimony as to whether he personally benefitted from the

$2,008.97 spent from his account and stated that he was "not on trial." At one point during his testimony, Jacob also asserted his Fifth Amendment privileges to questions related to the Robinhood account when he was confronted with the bank statement from his Bank of America account for the period of July 22, 2017 to August 23, 2017, which appeared to suggest the Robinhood account at issue was in his name. (Ex. 30).

The Debtors both testified that they were not sophisticated businesspersons, despite that GreenMind had 10 to 30 or more employees at various times over the course of its operations. Both testified to their concern and frequent meetings about how GreenMind would fund operations after the July 12, 2017 notice from CCB that it would no longer provide loans to GreenMind's customers. Peter testified that there was a lot of "craziness" during that period and that, while they were not trying to "do anything sneaky," the Debtors "wanted to have time" to come up with financing that would allow the business to complete the work in the "pipeline." The Debtors further testified that, during this period, creditors were constantly calling them and that they informed some creditors that they were moving the GreenMind Operating Account, although they could not recall to which entities they made such disclosures with any specificity.

On July 17, 2017, the Debtors informed James Truax, Chief Operating Officer of GreenMind, that the business was in significant financial distress and that employees may need to be laid off.  On or about July 18, 2017, the Debtors instructed Jacob to write a check to Mr. Truax for $5,917. Mr. Truax testified he was terminated the day after he received the check and that the payment was for "future services" in assisting GreenMind to complete projects for customers.  He deposited the check in an account owned by New Choice Credit, Inc. Mr. Truax testified that he had incorporated that company on July 17, 2017, with the idea of possibly transferring GreenMind "accounts" to it, and that he had offered the Debtors the opportunity

11

"sell through" that company.

The Debtors met with bankruptcy counsel and decided to terminate GreenMind's business on or about July 25, 2017. On August 4, 2017 (the "Petition Date"), the Debtors each filed a petition for relief under Chapter 7 of the Bankruptcy Code. The Chapter 7 Trustee (the "Trustee") has filed a report of no distribution in each of the Debtor's cases.

The Debtors testified that the majority of the funds returned to them by Jacob were used to pay their personal bankruptcy and litigation counsel.  Some portion of the funds were attached by creditors. The evidence shows that two days after a creditor apparently attached on trustee process or levied Oliver's Bank of America account (after the Petition Date), Oliver caused the remaining $2,640 in that account to be transferred to his wife's account at Bank of America.

The Debtors filed their initial schedules and SoFAs on August 25, 2017 (the "Original Disclosures"), three weeks after the Petition Date. (Exs. 2, 5). Evidence presented showed that as of the Petition Date, (i) Peter's bank accounts had the following balances: Bank of America Core checking account $7,405.44 (Ex. 21, Joint Pretrial Mem. ¶ (L)(13)), Wells Fargo joint checking $-351.20 (Ex. 17), and DCU $5.25 (Ex. 19), and (ii) Oliver's bank accounts had the following balances: Bank of America $7,887.80 (or $7,770.80, depending on the timing of a check card charge and a withdrawal on the Petition Date) (Ex. 26),  Wells Fargo joint checking $-50.00 (Ex. 22), Wells Fargo joint savings $0 (Ex. 24), and DCU $5.29 (Joint Pretrial Mem. ¶ (L)(14)). The Original Disclosures, which the Debtors reviewed and signed under the pains and penalties of perjury, did not disclose the following:[4]

   a.  The accurate balance as of the Petition Date of the respective Bank of America accounts. *See* Schedules A/B (each Debtor disclosed a balance in their respective account of

---

[4] Additionally, the Debtors each claimed an interest and exemption in office assets of GreenMind and possibly a vehicle, all of which had no ultimate value. *See* Schedules A/B and C.

$5,000);

b.   Interests in S.P.A.R.C.K LLC ("S.P.A.R.C.K"), a holding company registered in
     Massachusetts, see Certificate of Organization (Ex. 8),[5] and Holdings, see Schedules A/B
     and SoFA, Part 11;

c.   Transfers to Jacob in the amount of $25,495.97, see SoFA, questions 18 and 19; and

d.   The Doane lawsuit filed in or about April 2017 and pending in Edgartown District Court
     prior to the Petition Date, see SoFA, Part 4.

Additionally, Peter did not disclose the Wells Fargo and DCU accounts that he

maintained and used to transfer funds from the GreenMind Operating Account to himself before

he transferred the funds to Jacob, see Schedules A/B (Ex. 2), or the closing of any such accounts,

to the extent the accounts were closed, see SoFA, Part 8 (Ex. 2). Peter also did not disclose an

online Robinhood securities and cryptocurrency trading account having a balance of

approximately $350.

Oliver also did not include GreenMind information in Question 27 of the SoFA, see

SoFA, Part 11 (Ex. 5), but did disclose his interest in that entity in response to Question 19 of

Schedule A/B. Unlike Peter, Oliver did disclose a DCU checking account and a Wells Fargo

savings account in response to Question 17 of Schedule A/B (Ex. 5).

The Debtors presented no evidence of any additional disclosures that they may have

made to the Trustee in advance of or at the § 341 meeting of creditors conducted on

September 15, 2017 in each of their cases. On October 23, 2017, the Debtors each filed an

amended Schedule A/B (Exs. 3, 6) (the "Amended Schedules").[6] The Amended Schedules

---

[5] Peter testified that he had registered S.P.A.R.C.K on May 5, 2017, with the intention to hold the entity
dormant for several years in order to make it more attractive to potential lenders.

[6] The docket reflects that the amended schedules filed in Peter's case (Doc. No. 26, Ex. 3) had Oliver's
name in the caption. Peter testified that the amendment was intended to be his amendment and the docket
reflects that Peter signed a declaration regarding the amended schedules (Doc. No. 32) in response to a
notice of deficiency entered by the Court.

disclosed:

    a.    Savings accounts for each of the Debtors at Wells Fargo and checking accounts at DCU, but not the Wells Fargo checking accounts used in the transfer of funds from the GreenMind Operating Account to the Debtors before they transferred the funds to Jacob, *see* Amended Schedules A/B; and

    b.    The respective Debtors' interest in S.P.A.R.C.K, but not in Holdings. *See* Amended Schedules A/B.

The Amended Schedules did not address any of the other omissions or inaccuracies in the Original Disclosures.

The Court granted motions filed by the Plaintiffs to conduct the examinations of the Debtors pursuant to Rule 2004 as follows: Robert Doane on October 5, 2017; CCB and Elements on November 3, 2017; and Frog Funding on November 8, 2017. Plaintiffs filed their respective adversary proceedings each containing a number of §§ 523 and 727 counts. The Parties consented to consolidate and bifurcate the matters into multiple phases, Phase 1 being determination of the 727 Claims, which was only a common subset of the § 727 claims brought by the Plaintiffs.

## IV.  **Discussion**

Since bankruptcy is "an essentially equitable remedy . . . it is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction . . . . The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Tully*, 818 F.2d at 110 (citations and internal quotations omitted).

"In light of the effect on the [d]ebtor, a denial of discharge is an extreme step that should not be taken lightly . . . , and, therefore, the provisions of § 727 should be construed liberally in favor of debtors. Objections to discharge should be narrowly construed in furtherance of the Bankruptcy Code's fresh start policy[.]" *In re Barry*, 451 B.R. 654, 659 (B.A.P. 1st Cir. 2011)

(quoting *Annino, Draper & Moore, P.C. v. Lang (In re Lang)*, 246 B.R. 463, 468 (Bankr. D. Mass. 2000), *aff'd*, 256 B.R. 539 (B.A.P. 1st Cir. 2000)).  While the benefits of a discharge under the Bankruptcy Code are significant, they are not bestowed unconditionally. "[T]he fresh start policy is not the only policy objective which the Court must consider [and c]reditors are also entitled to be treated fairly." *Lang*, 246 B.R. at 468.  "[T]he very purpose of certain sections of the law, like [§§ 727(a)(2) and (a)(4)], is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Tully*, 818 F.2d at 110.

### A.    Section 727(a)(2)

To be denied a discharge under § 727(a)(2), a plaintiff "must show by a preponderance of the evidence that (1) the debtor transferred, removed, destroyed, mutilated, or concealed (2) his or her property (or the property of the estate if the transfer occurs post-petition) (3) within one year of the petition filing date (for prepetition transfers) (4) with intent to hinder, delay or defraud a creditor." *Groman v. Watman (In re Watman)*, 301 F.3d 3, 7 (1st Cir. 2002). Demonstrating constructive intent is insufficient under § 727(a)(2). The Court must find that a debtor acted with actual intent to hinder, delay, or defraud. *See, e.g, Lang,* 246 B.R. at 469. Intent will often turn on the credibility and demeanor of the debtors. *Watman*, 301 F.3d at 7; *Palmacci v. Umpierrez*, 121 F.3d 781, 785 (1st Cir. 1997). Given that conclusive direct evidence of intent is rarely available, courts also look "to the circumstances surrounding the transfer, . . . identif[ying] several objective indicia that, taken together, strongly indicate fraudulent intent." *Watman*, 301 F.3d at 8 (concluding that "[g]iven the practical difficulty of mounting direct evidence of the debtor's intent, few cases turn on such proof."); *see also Marrama v. Citizens Bank (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006) (recognizing,

even in the context of summary judgment, that "[b]ecause a debtor rarely gives direct evidence

of fraudulent intent . . . intent to defraud a creditor can be proved by circumstantial evidence.").

Those objective indicia include:

> (1) insider relationships between the parties;

> (2) the retention of possession, benefit or use of the property in question;

> (3) the lack or inadequacy of consideration for the transfer;

> (4) the financial condition of the party sought to be charged both before and after the transaction at issue;

> (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

> (6) the general chronology of the events and transactions under inquiry; and

> (7) an attempt by debtor to keep the transfer a secret.

*Watman*, 301 F.3d at 8 (internal citations omitted).

Because the Court bases its ruling on other facts in the record, it does not rule or make

findings on the *alter ego* allegations made by the Plaintiffs. Instead, the Court focuses on the

transfers by the Debtors of the funds they respectively received from the GreenMind Operating

Account over a five-day period from July 14–20, 2017, and the travel of those funds after the

funds were transferred to the Debtors.  While in some instances the Debtors' testimony implied

that they received funds from the GreenMind Operating Account for the benefit of GreenMind,

in other instances, at least one of the Debtors stated that he viewed the transferred funds as

repayment of amounts that they had contributed to GreenMind. Each Debtor answered "No" to

Question 23 of their respective SoFAs stating that they did not hold or control any property

owned by someone else, including property held in trust. (Exs. 2, 5). The Court does not have to

consider whether GreenMind was an *alter ego* of the Debtors, because the Court finds that the

transferred funds constituted property of the Debtors at least at the time when the funds were

transferred into their personal accounts.

The timing of and professed rationale for the Debtors' actions with respect to the prepetition transfers is suspect, and the evidence leads the Court to conclude that the Debtors transferred funds with the intent to hinder, delay, or defraud their creditors by transferring and concealing those funds. The evidence is not disputed that on July 14, 2017, shortly after Frog Funding provided funding to GreenMind and CCB had informed the Debtors that it would no longer finance solar panel projects for GreenMind's customers, the Debtors caused to be transferred from the GreenMind Operating Account $12,000 into Peter's personal account at Wells Fargo and $10,000 into Oliver's personal account at Wells Fargo.  On that same day, each of the Debtors transferred the same amounts into their respective personal accounts at DCU.  On July 18, 2017, Peter withdrew the $12,000 from his DCU account in cash.  On July 19, 2017, Oliver transferred the $10,000 from his DCU account back to his personal Wells Fargo account and withdrew that amount in cash the next day.  On July 19, 2017, Peter transferred an additional $4,434.63 from the GreenMind Operating Account to his personal account at DCU, leaving a balance in the GreenMind Operating Account of less than $1,000.  (Ex. 11).  On July 20, 2017, Peter withdrew $3,411 in cash from his personal DCU account.

Each of the Debtors testified that he was aware at all relevant times that a number of GreenMind creditors received regular payments by electronic ACH transfer from the GreenMind Operating Account and that they were personally liable to those creditors.  The Debtors' testimony as to the reasons for moving the funds between their accounts, withdrawing the funds in cash, and structuring the transfers in the manner they did was not credible.  This is amplified by the fact that neither of the Debtors mentioned at their Rule 2004 examinations their professed strategy to make themselves or Jacob more attractive to lenders in an effort to obtain alternative

17

funding sources.  When asked about the discrepancy in testimony, each Debtor could only offer

that he was not "prepared" for his Rule 2004 examination and distracted by life's other demands.

On July 12, 2017, before any funds were transferred by the Debtors from GreenMind's

Operating Account to themselves, each of the Debtors and their brother Jacob opened new

accounts at Bank of America.  In the period from July 18 through July 20, 2017, the Debtors

gave $25,495.97 in cash to their brother Jacob, and Jacob deposited that cash into his Bank of

America account (#7976). On July 24, 2017, the Debtors and Jacob went to a Bank of America

branch together and Jacob caused $7,310 to be transferred back to each of the Debtors' Bank of

America accounts, #7989 and #7992, and he withdrew cash in the amount of $2,950 that he

handed to one of the Debtors. Jacob retained $2,008.97 in his personal account at Bank of

America, and his bank statements reflect that the remaining funds were withdrawn in small

amounts in cash, used for purchases of food and other personal items, and transferred

approximately $500 electronically to what appears from the evidence to be Jacob's Robinhood

investment account. (Ex. 30). The Court concludes that Jacob benefitted from the $2,008.97 that

was left in his account.  Again, even considering the funds that were returned to the Debtors, the

Debtors still intended the original transfers to Jacob to be transfers upon which potential lenders

could rely in assessing Jacob's creditworthiness.

At all relevant times, each Debtor was aware that he was personally liable to some or all

of GreenMind's creditors and that his personal accounts may have been subject to attachment by

those creditors.  The Plaintiffs presented documentary evidence that, during the relevant time

periods, the Debtors were aware that creditors were commencing various judicial proceedings

against them.  The Debtors deny having actual notice of these cases or being influenced by the

actions of creditors.  Even if the Court accepts the explanation that the Debtors believed that they

could transfer funds to themselves, and later to Jacob, to facilitate additional financing that could be used for GreenMind, the Court draws the reasonable inference that the Debtors engaged in the series of transfers to avoid losing control of the last funds available to them.

The Debtors were aware that if the funds remained in the Green Mind Operating Account those funds would be dissipated by ACH payments to creditors. While the Debtors testified that they informed creditors that they were moving GreenMind's Operating Account, they were not credible when they implied that creditors were made aware that they were transferring the funds to themselves and that they, in turn, would transfer the funds to Jacob. Further, the Debtors were not credible when they explained their rationale for their convoluted transfers between their respective Wells Fargo and DCU accounts and subsequent cash withdrawals as being necessitated by transfer limits and as a means to impress possible lenders. The Court concludes from the evidence presented, and the reasonable inferences therefrom in light of the Debtors' circumstances at the time, that the Debtors intended to hinder, delay, or defraud their creditors by transferring and concealing the funds given to Jacob with the purpose of frustrating creditors of the Debtors and GreenMind from attaching those funds or otherwise interfering with the use of the funds by the Debtors.

The Debtors asserted that they intended that the funds transferred to Jacob would be used to show Bank of America that Jacob had money in his recently opened personal account, which would supposedly make him more worthy of credit.  They were also able to pay Mr. Truax $5,917, either out of a sense of obligation to him, as the Debtors testified, or to fund a transition period from which they or GreenMind's customers might benefit, which funds were not available to other potential creditors. Ultimately, the Debtors were able to fund some portion of their legal expenses with the funds returned to them and claimed an exemption in a portion of the remaining

19

funds in each of their bankruptcy cases.

Even though the amount of the funds ultimately retained by Jacob was relatively small, that amount was the result of transfers by the Debtors made with actual fraudulent intent as to their creditors.  As to the balance of the $25,495.97 transferred by the Debtors to Jacob that was returned by Jacob to the Debtors, the Court finds that, in a time of desperation and uncertainty, the Debtors moved the funds between accounts and made the transfers to Jacob with the intent to remove the funds to reduce risk of attachment and conceal such funds from their creditors.  The Debtors orchestrated the transfers as part of their concerted effort to retain control of those funds in order to use them for expenses they deemed important and to attract additional financing.

Unfortunately, the Debtors made a bad situation substantially worse for themselves in their attempts to control the funds at issue.  Here, each of the indicia of fraud is presented by circumstantial evidence, and when taken together, demonstrate by a preponderance of the evidence that the Debtors actually intended to hinder, delay, or defraud their creditors.  As such, judgment shall enter for the Plaintiffs and against the Debtors on counts asserting claims under § 727(a)(2).

### B.    Section 727(a)(7)

Section 727(a)(7) of the Bankruptcy Code provides that discharge may be denied where:

> the debtor has committed any act specified in paragraph (2) . . . of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case . . . concerning an insider[.]

11 U.S.C. § 727(a)(7). "Section 727(a)(7) extends the basis for denial of discharge to the debtor's misconduct in a substantially contemporaneous related bankruptcy case" of an insider. 6 *Collier on Bankruptcy* ¶ 727.10 (16th ed. 2018) (noting that "insider" is defined in § 101 and if the debtor is an individual, an insider includes relatives of the debtor). "[I]f the debtor engages in

objectionable conduct in a case involving a relative of the debtor, a partnership in which the

debtor is a partner, a general partner of the debtor or a corporation of which the debtor is an

officer, director or controlling person, the debtor may be denied a discharge in the debtor's own

case." *Id*.

It is undisputed that the Debtors are insiders with respect to each other in their individual

cases.  As set forth above, the Plaintiffs have met their burden of demonstrating grounds for

denial of each of the Debtors' discharges under § 727(a)(2).  Based on the testimony at trial of

transfers being made in coordination amongst the Debtors, the Court concludes that the Debtors

acted in concert with respect to the transfers that were the basis for the rulings on the objections

to discharge under § 727(a)(2) and, as such, judgment shall enter for the Plaintiffs and against the

Debtors on counts asserting claims under § 727(a)(7).

### C.   Section 727(a)(4)(A)

It is well-settled that consideration of a debtor's entitlement to discharge, while ordinarily

liberally construed in favor of a debtor, must be balanced with other circumstances in the case.

In the context of § 727(a)(4)(A), this includes the need for a debtor to be truthful and prepared to

make full disclosure "at the outset of the proceedings, so that decisions can be made by the

parties in interest based on fact rather than fiction . . . [and n]either the trustee nor the creditors

should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of

daylight." *Tully*, 818 F.2d at 110.  Section 727(a)(4)(A) provides that a bankruptcy court may

deny a discharge if "the debtor knowingly and fraudulently, in or in connection with the case,

made a false oath or account." 11 U.S.C. § 727(a)(4).  To support a request for denial of

discharge under § 727(a)(4)(A), a plaintiff must show that: (1) the debtor knowingly and

fraudulently made a false oath and (2) the false statement must relate to a material fact.  *See*

*Tully*, 818 F.2d at 110; *Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829, 837 (B.A.P. 1st Cir.

2011). "A debtor's discharge should not be denied under § 727(a)(4)(A) if the false statement [or

omission] is due to mistake or inadvertence . . . or if the mistake is technical and not real."

*Gordon v. Mukerjee (In re Mukerjee)*, 98 B.R. 627, 629 (Bankr. D.N.H. 1989) (citations

omitted).

Schedules, including Schedule A/B, and statements of financial affairs are made under

the pains and penalty of perjury and are, therefore, the equivalent of a verification under oath.

*See, e.g., Premier Capital, LLC v. Crawford (In re Crawford)*, 841 F.3d 1, 8 (1st Cir. 2016);

*Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 276 (B.A.P 1st Cir. 1999); *In re Koss*, 403 B.R.

191, 212 (Bankr. D. Mass. 2009). "The 'requirement of an honest, conscious effort to prepare

accurate, detailed and complete Schedules . . . is not intended as a trap for the unwary or undue

emphasis on technical compliance but, rather, as a reasonable quid pro quo.'" *In re Koss*, 403

B.R. at 212 (quoting *Guardian Indus. Prod., Inc. of Mass. v. Diodati (In re Diodati)*, 9 B.R. 804,

809 (Bankr. D. Mass. 1981)). It is undisputed that the Debtors' Original Disclosures and the

Amended Schedules contained omissions and, thus, the Debtors have each made a false oath for

the purposes of § 727(a)(4). *See, e.g., In re Crawford*, 531 B.R. 275, 306 (Bankr. D. Mass.

2015), *aff'd*, No. CV 15-12726-LTS, 2016 WL 8711505 (D. Mass. Feb. 26, 2016), *aff'd*, 841

F.3d 1 (1st Cir. 2016) (holding that "[w]hen a debtor omits a transaction from the statement of

financial affairs or makes a misstatement in the schedules, he or she has made a false oath for

purposes of § 727(a)(4)(A).").

The Debtors' false oaths must also be material to bar their discharges under § 727(a)(4).

A material fact under § 727(a)(4) is one that has a non-trivial effect upon the estate and the

creditors. *See Lussier v. Sullivan (In re Sullivan)*, 444 B.R. 1, 8 (Bankr. D. Mass. 2011). "The

subject matter of a false oath is material, . . . if it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property.'" *Nickless v. Fontaine (In re Fontaine)*, 467 B.R. 267, 273 (Bankr. D. Mass. 2012) (quoting *Tully*, 818 F.2d at 111 (external quotations omitted)). The materiality threshold is "fairly low," *Crawford*, 841 F.3d at 8, and is not dependent on whether a creditor can even reach an asset or whether omitted entirely, *see, e.g.*, *Crawford*, 841 F.3d at 9 (finding "[d]espite disclosing the value, [the First Circuit Court of Appeals] regarded the excluded IRA information as material); *Koss*, 403 B.R. at 212 (finding that "[t]he disclosure of personal property in one's bankruptcy schedules is material, [regardless] of a debtor's personal valuation, as it involves the existence and discovery of potential assets for estate disposition."). Courts have found that false statements made by failing to disclose transfers to family members in the statement of financial affairs are "highly material to the [d]ebtor's creditors because the trustee may be able to recover these funds as a preferential transfer or fraudulent conveyance." *Capital One Equip. Fin. Corp. v. Singh (In re Singh)*, 585 B.R. 330, 340 (Bankr. E.D.N.Y. 2018).

Additionally, under § 727(a)(4), "'[t]he existence of false or inaccurate [material] statements is not, in and of itself, sufficient cause to deny a debtor's discharge unless it is shown that these were knowingly and fraudulently made.'" *In re McCarthy*, 488 B.R. 814, 826 (B.A.P. 1st Cir. 2013) (quoting *Premier Capital, Inc. v. Diamond (In re Diamond)*, 106 F. App'x 73, 78 (1st Cir. 2004) (citations and internal quotation marks omitted)). Accordingly, "[t]he first element is satisfied if the debtor knows the truth and nonetheless willfully and intentionally swears to what is false." *Sullivan*, 455 B.R. at 837 (quoting *Mukerjee*, 98 B.R. at 629 (internal quotations omitted)). "'It makes no difference that [a debtor] does not intend to injure his creditors when a false statement is made—[c]reditors are entitled to judge for themselves what

will benefit, and what will prejudice, them.'" *In re Koss*, 403 B.R. at 211 (quoting *Chalik v.*

*Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir.1984) (internal quotations omitted)).

In the First Circuit, "'reckless indifference to the truth' . . . has consistently been treated

as the fundamental equivalent of fraud for purposes of § 727(a)(4)(A)," *Tully*, 818 F.2d at 112,

and "[a]ccording to the plain language of § 727(a)(4)(A), all that is required for a denial of

discharge is a single 'false oath or account,'" *Grondin*, 232 B.R. at 277.  However, "[t]he sheer

volume of misstatements or omissions in a debtor's sworn bankruptcy filings may [also]

preclude a finding of excusable inadvertence and instead establish the type of extreme

carelessness or reckless indifference that equates to fraud and a bar to discharge." *Irish Bank*

*Resolution Corp. Ltd. v. Drumm (In re Drumm)*, 524 B.R. 329, 395 (Bankr. D. Mass. 2015),

*aff'd*, No. 15-CV-10184-LTS, 2015 WL 9911447 (D. Mass. Nov. 20, 2015) (internal quotations

omitted); *see also Fontaine*, 467 B.R. at 273 (concluding that the debtor's cumulative omissions

of failing to identify a lawsuit, list the transfers of certain property, and include the full extent of

his business activities and his spouse's income established his reckless indifference "beyond

doubt").

"Moreover, because a debtor rarely gives direct evidence of fraudulent intent, intent to

defraud a creditor may be established by circumstantial evidence or inferred from a course of

conduct."  *McCarthy*, 488 B.R. at 826; *see also Desmond v. Varrasso (In re Varrasso)*, 37 F.3d

760, 764 (1st Cir. 1994).  However, a "debtor's honest confusion or lack of understanding may

weigh against an inference of fraudulent intent." *McCarthy*, 488 B.R. at 827.

"[T]he burden of proof rests with the [plaintiff] but once it reasonably appears that the

oath is false, the burden falls upon the [debtor] to come forward with evidence that he has not

committed the offense charged." *Tully*, 818 F.2d at 110 (internal quotation marks omitted). In

considering a debtor's explanations regarding omissions, a finder of fact must determine whether

such excuses are credible or ultimately just "self-serving lamentations" that are suspect. *Id*. at

111 (examining the debtor's efforts "to explain away his omissions" and concluding that "[t]he

short answer to these plaints is that the bankruptcy judge—the factfinder of first resort . . .

considered them and found them wanting."). In *Tully*, the First Circuit affirmed the bankruptcy

court's assessment under the circumstances of the case that the debtor's omission of assets from

his schedules was not excused by his counsel's assertion of fault or the subsequent amendment

of schedules after discovery of the omission at the § 341 meeting. *See id*. at 111 n.5.

The First Circuit stated that:

> [a] petitioner cannot omit items from his schedules, force the trustee and the
> creditors, at their peril, to guess that he has done so—and hold them to a
> mythical requirement that they search through a paperwork jungle in the hope
> of finding an overlooked needle in a documentary haystack. Nor can an
> attorney's willingness to bear the burden of reproach provide blanket immunity
> to a debtor; it is well settled that reliance upon advice of counsel is, in this
> context, no defense where it should have been evident to the debtor that the
> assets ought to be listed in the schedules.

*Id*. at 111.

In *McCarthy*, the Bankruptcy Appellate Panel recognized that confusion or lack of

understanding could weigh against an inference of fraudulent intent. *See* 488 B.R. at 827.

However, the debtor in that case argued that he lacked the requisite intent because he suffered

from ADHD, which impaired his working memory, but "the bankruptcy court [ultimately] did

not believe the [d]ebtor's claims of innocence, and unequivocally rejected his explanation for his

inability to properly disclose his assets." 488 B.R. at 827.

In addition, claiming that an asset was omitted because it had little or no value is not a

legitimate excuse without significantly more. In order for the bankruptcy process to function,

debtors have an absolute duty to report all assets "even if they believe their assets are worthless

or are unavailable to the bankruptcy estate." *Wood v. Premier Capital, Inc. (In re Wood)*, 291

B.R. 219, 226 (B.A.P. 1st Cir. 2003). Similarly, in *In re Sohmer*, the bankruptcy court found that

a debtor cannot defeat a claim under § 727(a)(4) by asserting that a bank account contained little

or no funds. *Massachusetts v. Sohmer (In re Sohmer)*, 434 B.R. 234, 253 (Bankr. D. Mass.

2010).

Because the Debtors do not dispute certain untrue statements were made in the Original

Disclosures and Amended Schedules, the burden shifts to the Debtors to explain the omissions or

inaccuracies.  The Court must assess whether the Debtors made material false statements with an

intent to deceive or reckless indifference to their accuracy. The volume of false statements or

omissions in the Original Disclosures and Amended Schedules leads the Court to conclude that

at least some of the false statements were material and were made intentionally or with reckless

indifference to their accuracy. *See Drumm*, 524 B.R. at 395.  In their trial testimony, the Debtors'

attempts to explain the false statements as mere oversights or mistakes fell short and were not

credible. The transfer of funds between the Debtors' accounts and then in cash to Jacob would be

material to any creditor and the Trustee. Similarly, the Debtors' interests in other entities and an

investment account also would be material.

Days before their bankruptcy filings the Debtors engaged in a significant, coordinated

effort to transfer funds through their personal Wells Fargo checking accounts and DCU accounts

before withdrawing the funds in cash to give the funds to Jacob.  It is simply not believable that

Peter could have overlooked the existence or closing of those accounts when completing his

schedules or that each of the Debtors could have overlooked the transfers to Jacob when

responding to Question 18 in their respective SoFAs. Even if these omissions were not

intentional, they demonstrate reckless indifference on the part of the Debtors. The questions

answered incorrectly by the Debtors on their SoFAs were clear and direct. The Debtors

eventually filed their respective Amended Schedules, which still contained omissions, but never

amended their SoFAs to disclose the transfers to their brother. They also offered no evidence that

they voluntarily disclosed to the Trustee or any other party in interest information about the

transfers prior to or at the § 341 meeting of creditors or before questions were asked or records

were requested that would have uncovered the omissions.

While the Debtors attempted to explain the insignificance of their omitted interests in

Holdings by testifying that it had no assets and that they had only established it to "age,"[7] their

determination of the value of their interests and the materiality of their interests is unavailing.

Similarly, the Debtors testified that they established S.P.A.R.C.K in May of 2017 to "age" that

entity for future use.  S.P.A.R.C.K had no assets as of the petition date.  While the Debtors'

interests in these entities might be barely material in isolation, it is clear that the Debtors had

placed some value on establishing these entities and were aware of their respective interests.

Again, the questions answered incorrectly by the Debtors on their schedules and SoFAs were

clear and direct.  The Debtors' identical failures to disclose these interests, when viewed

together, are among a series of omissions that demonstrate that the omissions were made at least

with reckless indifference to the truth.

Further, Peter does not dispute that he had a small Robinhood investment account on the

Petition Date.  Standing alone, it is possible to understand overlooking this small account even in

the Amended Schedules, but, under the circumstances, the omission supports the conclusion that

Peter was at least recklessly indifferent to the truth of statements being made in the Original

---

[7] The Debtors testified that they believed that the entity could have some future use to them and that "aging" and financial activity may have had some benefit to future business based on online research they had conducted.  They also testified that they had caused funds to be transferred in and out of that entity in 2016 to show that it had had some financial activity for the purpose of creating future value in the shell.

Disclosures and Amended Schedules. This is also the case in relation to each Debtor's minor

inaccurate statements of the balances of their respective Bank of America accounts as of the

Petition Date and the Debtors' failure to disclose the Doane litigation.

Alluding to *Tully* in argument, counsel to the Plaintiffs characterized the process of

obtaining full disclosure from the Debtors as a tug-of-war where information had to be dragged

from the Debtors through the process of the § 341 meeting, incomplete amendment to schedules,

document demands, and Rule 2004 examinations. *See* 818 F.2d at 110. The efforts undertaken to

attempt to elicit accurate information from the Debtors are relevant to the Court's assessment.

The required efforts to obtain disclosure of the transfers of cash to Jacob are particularly

problematic given that those transfers occurred in the month prior to the Petition Date and were

made in a manner that suggests significant amount of effort went into planning and executing the

transfers.

Accordingly, the Plaintiffs have met their burden of demonstrating grounds for denial of

each of the Debtors' discharges under § 727(a)(4)(A).

**V.      Conclusion**

Based on the foregoing, the Court finds for the Plaintiffs on all counts brought under 11

U.S.C. §§ 727(a)(2), (a)(4), and (a)(7) in above captioned adversary proceedings.  Judgment

shall enter in favor of the Plaintiffs by separate order in accordance with this decision.


Entered this 22nd day of October, 2018          By the Court,



                                                _____
                                                Christopher J. Panos
                                                United States Bankruptcy Judge


28